NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1344-14T2
                 A-3634-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAMMEN D. MCDUFFIE,
a/k/a BUCKEY MCDUFFIE,
DAMEN MCDUFFY, DAMEN MCDUGGY,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

HAKEEM A. CHANCE, a/k/a
HAKIM CHANCE,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| June 13, 2017 |
| APPELLATE DIVISION |

        Submitted May 4, 2017 — Decided June 13, 2017

        Before Judges Lihotz, O'Connor and Mawla.

        On appeal from Superior Court of New Jersey,
        Law Division, Bergen County, Indictment No.
        12-12-1785.

        Joseph E. Krakora, Public Defender, attorney
        for appellant Dammen D. McDuffie (Alison
        Perrone, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Hakeem Chance (Gilbert G. Miller, Designated Counsel, on the brief).

Gurbir S. Grewal, Bergen County Prosecutor, attorney for respondent (Suzanne E. Cevasco, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

In these back-to-back appeals, co-defendants Dammen D. McDuffie and Hakeem A. Chance, jointly tried before a jury, separately appeal from a July 29, 2014 judgment of conviction. Co-defendants argue the trial judge impermissibly denied their motions requiring the State to release information regarding a global positioning system (GPS) tracking device used to prove their involvement in two burglaries. Also, co-defendants argue the judge erroneously admitted testimony regarding the prior military training of a police officer, who identified McDuffie as the passenger in the vehicle driven by Chance. More specifically, each defendant articulates these challenges, seeking to vacate his conviction:

> POINT ONE
>
> THE TRIAL COURT DEPRIVED DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WITH A MEANINGFUL OPPORTUNITY TO PRESENT A COMPLETE DEFENSE BY SUSTAINING DETECTIVE ECKERT'S REFUSAL TO DISCLOSE INFORMATION REGARDING THE MODEL NUMBER OF THE

GPS TRACKING DEVICE INSTALLED ON THE BMW, THE LOCATION WHERE IT WAS INSTALLED, THE TYPE OF BATTERY WHICH POWERED THE DEVICE, AND THE LENGTH OF TIME IT COULD BE EXPECTED TO HOLD A CHARGE SUFFICIENT TO TRANSMIT RELIABLE DATA.

<u>POINT TWO</u>

TESTIMONY THAT DETECTIVE AROCHAS WAS A TRAINED MILITARY SHARPSHOOTER AND THUS HAD SPECIAL TRAINING AND EXPERTISE IN MAKING RELIABLE SPLIT-SECOND IDENTIFICATIONS WAS NOT RELEVANT, AND ITS POTENTIAL FOR PREJUDICE FAR OUTWEIGHED WHATEVER PROBATIVE VALUE IT MIGHT HAVE HAD.

Finally, each defendant challenges the imposed sentence as manifestly excessive.

We have reviewed these arguments in light of the record and applicable law. We affirm each conviction. However, insufficient factual findings require we remand for resentencing and correction of the judgments of conviction.

We recite the facts related to the issues on appeal, taken from the record of the ten-day trial. After obtaining a warrant, Detective James Eckert, of the Bergen County Prosecutor's Office (BCPO), installed a tracking device on a dark blue BMW X6 (BMW) registered to Chance's mother. The designated device is available only to law enforcement; however, components of the device, including the GPS chip, are sold commercially. The GPS records location data on the device itself, and transmits its position via

cell towers, which allows police to track the device location in real time on a laptop.

On July 12, 2012, a joint surveillance team commenced the operation. The team consisted of detectives from the BCPO Special Investigation Squad who were assisted by local police, operating three unmarked vehicles. BCPO Sergeant John Booth was in charge of the team. He occupied the tracking vehicle, which was driven by Detective Jonathan Arochas and contained Detective James Eckert, the GPS expert, and Detective Michael Falotico. The first of two trailing vehicles contained only BCPO Detective Elliott Cookson; the other vehicle, driven by Detective Edward Young of the Fort Lee Police Department, was also occupied by undercover officers from Hackensack and Teaneck. The officers in the three vehicles communicated with one another using portable radios. Detective Eckert tracked the BMW in real time via the GPS data transmitted to his laptop, and the officers in the trailing vehicles maintained intermittent visual contact with the BMW.

In the days leading up to the investigation under examination, the accuracy of the GPS device was checked, using visual observations. Immediately prior to the events on the evening of July 12, 2012, Detective Eckert confirmed the GPS device was functioning properly and accurately recording the BMW's location. Specifically, Detective Eckert observed the BMW in the parking lot

of the Hilton Hotel in Hasbrouck Heights, the same location the GPS pinpointed the BMW.

At 7 p.m. Detective Young observed Chance enter the BMW, still parked at the Hilton in Hasbrouck Heights, and drive off. Detective Eckert used the GPS device while occupying the tracking vehicle, and the trailing vehicles confirmed the BMW, driven by Chance, traveled to Englewood and stopped on William Street, across from McDuffie's address, at 7:32 p.m. Chance returned to the Hilton and again began to travel at 8:42 p.m. The BMW was tracked to the vicinity of Dubois Court, Englewood, where it stopped for two minutes. Detective Eckert acknowledged Dubois Court, which is not a public street, was not specifically displayed on the laptop map. No officer physically observed McDuffie enter the BMW. However, Detectives Cookson and Eckert noted Chance and a black male passenger in the BMW when it stopped for gas on Route 4.

The police continued to track the BMW as it headed North on the Garden State Parkway and exited in Nutley at 9:31 p.m. After driving around Nutley, at 9:40 p.m., the BMW drove down Spatz Avenue, a cul-de-sac, turned around, drove one block over and parked on Margaret Avenue. The BMW remained parked on Margaret Avenue for eleven minutes. During this time, the three law enforcement vehicles were parked approximately three blocks away,

and the officers did not observe the BMW parked on Margaret Avenue or see defendants.

A few minutes after 10 p.m., Sergeant Booth received a call from the Nutley Police Department, informing him police received notice an alarm was triggered from a home on Spatz Avenue. Later that evening or early the next morning, Nutley police also received information regarding the robbery of a second home on Spatz Avenue.

Spatz Avenue is a short dead end street, with the dead end abutting the Garden State Parkway. The two vandalized homes on Spatz Avenue sit adjacent to one another. The first owner testified his residence, from which the alarm call was sent, was ransacked, but nothing was stolen. The second owner, a Newark Police Officer, reported his home was broken into some time while he was at work and listed missing items as a laptop, an iPod, $400 cash, and $14,500 in jewelry.

After receiving the call from the Nutley police, Detective Booth instructed the trailing vehicles to stop the BMW. Detective Cookson pulled behind the BMW. The BMW, followed by Cookson, passed the parked second trailing vehicle, which joined the pursuit. Finally, the tracking vehicle followed behind the other two police vehicles.

When the BMW stopped at a traffic light located at the intersection of Centre Street and East Passaic Avenue, Detective

Arochas pulled alongside the BMW and activated the police lights and siren to commence a motor vehicle stop. Detective Cookson attempted to pull in front of the BMW to block its lane of travel. Before he could do so, the traffic signal changed, the BMW accelerated, and collided with Detective Cookson's vehicle. The BMW then slammed into Detective Arochas's vehicle. As a result, the laptop was jarred from Detective Eckert's grasp and closed, terminating the real time GPS link. The BMW swerved again, hitting Detective Young's vehicle and sped away.

The BMW accelerated, reaching a high rate of speed; it ignored several traffic signals, and drove on the wrong side of the road. Detective Arochas led the police pursuit and maintained consistent visual contact. He watched the BMW strike a center concrete barrier, while making a sharp left turn. The impact punctured the front left tire, yet the vehicle continued traveling on the rim. The BMW could not negotiate a curve on Long Hill Road, Little Falls, on three wheels and collided into a stone wall.

As Detective Arochas's vehicle pulled perpendicular to the stopped BMW, the passenger briefly turned and faced him. Detective Arochas was able to get a full view of the passenger's face, illuminated by headlights, before the passenger turned away and fled the BMW. Chance also abandoned the vehicle, but was found

approximately fifty feet from the crash site and arrested. Despite Detective Young's efforts, the passenger escaped.

Detective Eckert retrieved the GPS device and downloaded the location data. The subsequent search of the BMW recovered two iPhones traced to Chance, a mini flashlight, a black bandana, ski mask and one sneaker on the driver's side, and a pair of sneakers and a cell phone on the passenger's side. None of the reported stolen property was recovered or found along the chase route.

In an unrelated investigation, another officer provided a tip to Detective Arochas, received from a credible confidential informant that "Dammen McDuffie" was involved in the burglaries. Detective Arochas determined McDuffie lived on Dubois Court in Englewood, the same area where the BMW stopped prior to proceeding to Spatz Avenue on July 12. Searching motor vehicle records, he found McDuffie's photograph and instantly recognized him as the passenger he saw in the BMW. Police obtained an arrest warrant and went to McDuffie's residence.

McDuffie was located, standing behind his vehicle, in the parking lot outside his home on Dubois Court. Four unmarked police vehicles, carrying at least five officers, including Detectives Eckert and Young, which surrounded McDuffie, identified themselves, and attempted to place him under arrest. When ordered to get on the ground, McDuffie unsuccessfully attempted to run,

but was grabbed and arrested. McDuffie resisted efforts to handcuff him.

At trial, Sergeant John Booth, Detectives Eckert, Arochas, and Falotico, who were in the tracking vehicle on July 12, along with Detectives Cookson and Young from the trailing vehicles, testified. Detectives Eckert and Cookson identified Chance as the driver of the BMW. Detective Young described the male passenger in the BMW; Detective Arochas specifically identified McDuffie as the passenger he saw flee following the crash.

At the close of evidence, the jury convicted McDuffie of two counts of third-degree burglary, N.J.S.A. 2C:18-2, and the disorderly persons offense of resisting arrest, N.J.S.A. 2C:29-2. He was acquitted of hindering apprehension. Chance was convicted of two counts of third-degree burglary, three counts of second-degree eluding/failure to stop, N.J.S.A. 2C:29-2(b), and eight counts of fourth-degree aggravated assault on a police officer, N.J.S.A. 2C:12-1(b)(5)(A). McDuffie's motion for a new trial was denied. Sentence was imposed for each defendant and this appeal followed.

Co-defendants seek to reverse their convictions challenging the admissibility of evidence from the GPS unit and testimony regarding Detective Arochas's prior military training. The standard for reviewing these issues requires we consider whether

the trial judge abused his discretion. State v. Ates, 426 N.J. Super. 521, 537 (App. Div. 2012), aff'd, 217 N.J. 253 (2014), cert. denied, __ U.S. __, 135 S. Ct. 377, 190 L. Ed. 2d 254 (2014). We consider these two issues.

Co-defendants argue their right to a fair trial was impeded because the judge denied their motions to suppress the GPS data and to disclose specific information regarding the nature and location of the GPS device. During a December 19, 2013, pre-trial Rule 104 hearing, Detective Eckert, who personally installed the device, was the only witness. He testified regarding his training and expertise with the GPS device. He stated the device's efficacy was dependent upon proper use and acknowledged on occasion the device distorted speed or displayed inaccurate information when losing power or when the signal was disrupted by reflections from water or very tall structures. During cross-examination, Detective Eckert declined to disclose the model of the GPS device, where police installed the device on the BMW, the exact battery used to power the device and the duration of a single charge. Detective Eckert confirmed the device was used not just in Bergen County, but by hundreds of other law enforcement agencies across the country. Co-defendants objected, asserting non-disclosure of the identifying information prevented them from engaging an expert who could contest the reliability of the GPS readings.

The trial judge considered and rejected co-defendants' arguments. He stated co-defendants' requests would provide information to identify "the actual item," disseminating the exact GPS device, now exclusively accessible to law enforcement, to "many people." Further, he noted co-defendants retained the opportunity to cross-examine Detective Eckert and retain an expert if they chose. He concluded the GPS data was admissible. At trial, Detective Eckert was again asked where the device was installed on the BMW. The State's objection was sustained.

On appeal, co-defendants maintain withholding the GPS information impeded their ability to assert a complete defense, thus violating their due process rights. See Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146, 90 L. Ed. 2d 636, 645 (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413, 420 (1984))). The issue implicates the government's privilege to protect law enforcement methods.

Our law includes authority addressing the law enforcement privilege, when police seek to protect the identity of informants. In State v. Milligan, 71 N.J. 373 (1976), the Supreme Court noted at "common law" there exists a "governmental privilege to withhold the identity of informants who assist law enforcement officials."

Id. at 380; see also Cashen v. Spann, 66 N.J. 541, 552, cert. den. 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975) (recognizing the government's privilege to protect confidential informants). Currently, N.J.R.E. 516 recognizes this privilege, as set forth in N.J.S.A. 2A:84A-28, which states:

> A witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States to a representative of the State or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his identity is essential to assure a fair determination of the issues.

The right to anonymity of informants, however, is "not absolute." Milligan, supra, 71 N.J. at 383. In criminal prosecutions, a court must balance the competing interests of criminal defendants and the State, a concept stated in federal jurisprudence.

> The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible

significance of the informer's testimony, and other relevant factors.

> [Id. at 384 (quoting Rovario v. United States, 353 U.S. 53, 62, 77 S. Ct. 623, 628, 1 L. Ed. 2d 639, 646 (1957)).]

If the State can demonstrate the applicability of a qualified privilege not to disclose sensitive investigation techniques the "court then must balance the public interest in nondisclosure against 'the need of a particular litigant for access to the privileged information,' . . . ." United States v. Matish, 193 F. Supp. 3d 585, 597 (E.D. Va. 2016) (quoting In re The City of New York, 607 F.3d 923, 948 (2d. Cir. 2010)).

The Court emphasized this test requires a defendant to demonstrate a need for the specific information the government seeks to protect. "[F]rivolous demands for information [or] unsubstantiated allegations of need" will not be enough to justify disclosure because "[s]omething more than speculation should be required of a defendant before the court overrules an informer's privilege of nondisclosure." Milligan, supra, 71 N.J. at 393. It is now well established that "absent a strong showing of need, courts generally deny disclosure where the informer plays only a marginal role, such as providing information or 'tips' to the police or participating in the preliminary stage of a criminal investigation." Id. at 387; see also State v. Hernandez, 225 N.J.

451, 467 (2016) (applying <u>Milligan</u>'s balancing test stating: "At least at this stage, we cannot find that the disclosure of the Witness's identity in the unrelated investigations is necessary for defendants to receive a fair trial in this case."); <u>State v. Florez</u>, 134 <u>N.J.</u> 570, 578 (1994) ("Without a strong showing of need, courts will generally deny a request for disclosure.").

The State has also asserted the privilege when declining to disclose surveillance vantage points. <u>See</u> <u>State v. Garcia</u>, 131 <u>N.J.</u> 67, 70 (1993). The privilege, set forth in <u>N.J.R.E.</u> 515, is grounded on <u>N.J.S.A.</u> 2A:84A-27, which provides:

> No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public.

In <u>Garcia</u>, the Court held the precise location of a law enforcement surveillance vantage point remained privileged if there is "a realistic possibility that revealing the location would compromise present or future prosecutions or would possibly endanger lives or property." <u>Garcia</u>, <u>supra</u>, 131 <u>N.J.</u> at 78. If the State makes such a preliminary showing, disclosure of the location should only occur where it "infringes on a defendant's constitutional rights." <u>Id.</u> at 79; <u>see also</u> <u>State v. Laws</u>, 262

N.J. Super. 551, 558-59 (App. Div.), certif. denied, 134 N.J. 475 (1993).

As in the case of overcoming an informant's privilege, a defendant must first articulate an actual need for disclosure related to the defense. "Absent some showing of need by a defendant for the exact surveillance location, the trial court should deny its disclosure. In reaching that conclusion we note 'the ease with which the privilege would be destroyed if disclosure were required without a substantial showing of need for it.'" Garcia, supra, 131 N.J. at 80-81 (quoting State v. Oliver, 50 N.J. 39, 47 (1967)).

Accordingly, when considering application of the privilege provided in N.J.R.E. 515, a judge engages a Milligan-type balancing test, weighing "the crime charged, the possible defenses, the potential significance of the privileged information and other relevant factors." State v. Zenquis, 131 N.J. 84, 88 (1993) (citing Garcia, supra, 131 N.J. at 80-81). An added requirement identified in this analysis is the degree to which the testimony of the surveillance officer is corroborated by other evidence. Garcia, supra, 131 N.J. at 82-83 (denying disclosure of surveillance location noting corroboration of the criminal activity was provided by an informer's information and drugs found in the location when identified by the police officer conducting

surveillance); <u>see also</u> <u>Zenquis</u>, <u>supra</u>, 131 <u>N.J.</u> at 88-89 (requiring disclosure of surveillance vantage point to protect the defendant's confrontation rights because there was no corroboration and no drugs discovered on the suspects or in the identified location).

These authorities provide guidance to examine defendant's demand for disclosure of the GPS device specifics, which the State claims are privileged. Although the exact issue has not been addressed by our appellate courts, these guidelines must be followed in weighing these interests.

First, we emphasize a defendant's broad claim of need for disclosure of police procedures, claimed to be privileged, is insufficient to compel disclosure. Rather, a particularized need related to advance a stated defense must be shown. <u>Florez</u>, <u>supra</u>, 134 <u>N.J.</u> at 578 (stating disclosure should be denied unless the criminal defendant makes a sufficient "showing of need" for the information); <u>Garcia</u>, <u>supra</u>, 131 <u>N.J.</u> at 80 ("If the State meets its preliminary burden for application of the privilege, the court should permit disclosure if the information sought is relevant and helpful to the defense or essential to a fair determination of the case.").

Second, the judge must determine whether the opportunity to cross-examine the officer, asserting non-disclosure based on

privilege, satisfies a defendant's need to challenge the credibility of the testifying witness. For example, inquiry regarding specific techniques to use the device, issues affecting the officer's ability to effectively use the equipment, known or demonstrated flaws or deficiencies in use, are easily raised on cross-examination to challenge the proficiency of the user and even the accuracy of the device.

Third, law enforcement must provide corroborating evidence extrinsic to the GPS, which ensures a defendant's rights of confrontation and fair trial are protected. As with a claimed confidential surveillance location, some corroboration is necessary to confirm the reliance of GPS location evidence.

Finally, whether a defendant has the opportunity to provide expert testimony to attack the evidence without disclosure of the requested information must be weighed.

Here, co-defendants do not challenge Detective Eckert's qualifications as an expert in the use of the GPS device. See N.J.R.E. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."); see also United States v. Thompson, 393 F. App'x 852, 858 (3d Cir.

2010) (holding the trial judge properly allowed a lay witness to testify to the results of GPS tracking where the witness had particularized knowledge of the GPS's reliability by virtue of his experience using the device). Rather, we deduce co-defendants' claims seeking the GPS device specifications and location on the BMW challenged the accuracy and reliability of the GPS device's technology and reported information.

Generally, the accuracy of GPS devices is accepted. "[I]n assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy." United States v. Brooks, 715 F.3d 1069, 1078 (8th Cir. 2013). Our courts routinely order GPS technology to supervise individuals released pending trial or on parole. See N.J.S.A. 30:4-123.92 (establishing a program for the continuous, satellite-based monitoring of sex offenders); N.J.S.A. 2A:162-17(b)(2)(a)-(1) (permitting the court to place non-monetary conditions on pre-trial release, including GPS monitoring). Moreover, commercial GPS units are widely available, and "smart phones" and laptops all contain a form of GPS tracking capability. See United States v. Jones, 565 U.S. 400, 428-31, 132 S. Ct. 945, 962-64, 181 L. Ed. 2d 911, 933-34 (2012) (Alito, J., concurring) (noting modern devices contain GPS, the technology is ubiquitous and represents an inexpensive alternative to traditional physical surveillance);

id. at 415, 132 S. Ct. at 955, 181 L. Ed. 2d at 925 (Sotomayor, J. concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail. . . ."); see also State v. Earls, 214 N.J. 564, 578-79 (2013) (discussing GPS technology used in cell phones). Nevertheless, we have no doubt an expert in this area could opine on what alters the accuracy of a GPS device, including what information must be evaluated to make the determination. Co-defendants offered no such proofs.

Perhaps recognizing these holdings, and noting a challenge to the accuracy of the GPS device required expert testimony, see State v. Martini, 160 N.J. 248, 263 (1999) (holding expert testimony may be admitted where the accuracy or trustworthiness of evidence is challenged), co-defendants argue their ability to obtain an expert was precluded because the information was not revealed. We are not persuaded by co-defendants' circular reasoning.

The State revealed the computer chip technology responsible for sending and receiving radio signals, employed by the GPS device and released the actual location data the device collected. The related datasheet included the manufacturer of the computer sheet and the recorded location of the BMW, the number of satellites the device was connected to, and the accuracy, to the meter, of the

19

reported location. In our view, this technical data provides an adequate foundation for an expert to identify any additional information necessary to challenge the GPS device's accuracy. Co-defendants did not present an affidavit of an expert to explain common areas of unreliability of GPS devices or offer a link to how the location on the BMW affected the device's reporting. Moreover, no expert explained what information was needed to make this assessment. The lack of expert testimony or other evidence to establish how the undisclosed information was "essential to a fair determination of the case," defeats co-defendants' request for disclosure. Garcia, supra, 131 N.J. at 80.

Co-defendants also suggest the sole evidence tying them to the scene of the burglaries was the GPS data, requiring the requested disclosures. As we stated above, corroboration is necessary. Zenquis, supra, 131 N.J. at 89. Based on the record evidence, we reject co-defendants' assertions as unfounded. Unrefuted facts prove police tested the accuracy of the GPS device prior to commencing surveillance. Detective Young saw Chance enter the BMW and Detective Cookson confirmed two men occupied the BMW after it was shown to stop near McDuffies' residence. The BMW was observed exiting the highway in Nutley, and after a house alarm was tripped on Spatz Avenue, the BMW passed the trailing surveillance vehicles prior to stopping at the light on Centre

Street and East Passaic Avenue as it headed toward the Parkway entrance. These uncontroverted facts sufficiently corroborate the GPS data confirming the location of the BMW occupied by defendants.

Co-defendants further urge reversal arguing the trial judge ignored proof of "inconsistencies" in the GPS readings, which showed the device incorrectly recorded the BMW traveled at various implausible speeds. The "inconsistencies" in the GPS data identified by co-defendants were examined during Detective Eckert's testimony. He admitted certain readings showed a "mistake, but only in speed, not in GPS location." The evidence was not offered to prove speed, nor was speed an element of any offense charged.

Having considered each of these arguments, we reject co-defendants' claim the trial judge abused his discretion in denying their motion for disclosure. See State v. Sessoms, 413 N.J. Super. 338, 342 (App. Div. 2010). The judge balanced the competing considerations and weighed the claimed needs presented by the State and co-defendants. In light of co-defendants' general claim for release of the GPS specifications and its location on the BMW, and the absence of a showing of need for these specifics, we conclude the interests of the State must prevail to protect ongoing and future investigations.

21

Co-defendants' next challenge the admission of Detective Arochas's prior military training, as aiding his identification of McDuffie, despite viewing him for "a split second" in nighttime conditions. Detective Arochas testified his training as a Marine Corps sniper provided special training and expertise, which enabled him to remember faces.

Co-defendants assert the trial court erred in admitting statements Detective Arochas was trained as a Marine Corps sniper, not relevant to his ability to identify the passenger in the BMW. Co-defendants maintain Arochas's prior military training had no relationship to his ability to observe "from mobile vantage points and . . . make reliable split second identifications under . . . hectic, harrowing and distracting circumstances."

The issue arose in limine, as co-defendants moved to bar Detective Arochas background training and experience, arguing the testimony was prejudicial. The trial judge denied the motion concluding this background, specifically the training involving memory tests to recall observed details, was relevant to the detective's ability to identify McDuffie.

When Detective Arochas was questioned regarding his "special training and experience" as a Marine, McDuffie's objection was overruled. Detective Arochas then testified he attended the Marine Corps sniper school and underwent three-months of training in

"memory, observation, and concentration." He explained the "memorization school" required "burning an image into your head so you can identify the objects later. . . . [Y]ou'll look at a picture for a brief split second, then you'll . . . write down what you saw in that picture[,]" requiring recall of seven of ten objects to qualify as a sniper. He then described his observations of McDuffie during the investigation and chase. He insisted his prior training enabled him to remember McDuffie's facial characteristics, even though he saw him very briefly.

An evidentiary decision is reviewed for an abuse of discretion. "To demonstrate abuse of such discretion, the danger of undue prejudice must outweigh probative value so as to divert jurors 'from a reasonable and fair evaluation of the basic issue of guilt or innocence.'" State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div.), certif. denied, 111 N.J. 653 (1988)).

N.J.R.E. 403 allows a court to exclude relevant evidence "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." The challenged testimony related to Detective Arochas's ability to observe and recall details,

23

explicitly, a suspect's physical appearance, which related to identification at the scene.

Co-defendants repeat their objection related to the "sniper training" testimony, insisting it was not relevant and was excessively prejudicial. The arguments do not explain why the described memory training and testing was not relevant to Detective Arochas's recall. Co-defendants' arguments merely suggest nighttime conditions, limited lighting, and rapidly changing events impeded the detective's observations and concentration, areas we note that were fully explored on cross-examination.

We reject as lacking merit the claims of error, arguing Detective Arochas "was not qualified as an expert in identification" and his statements caused the jury to ignore the jury instruction directed to the accuracy of cross-racial identifications. The testimony was not an area admissible only if supported by expert opinion. Further, "we trust juries to follow instructions." State v. Short, 131 N.J. 47, 65 (1993). We have no reason to conclude the jury did not do so in this case.

Accordingly, we conclude the trial judge did not abuse his reasoned discretion when reviewing the evidence and rejecting co-defendants' motion to bar admission of Detective Arochas's prior qualifications. State v. Collier, 316 N.J. Super. 181, 193 (App. Div. 1998), aff'd, 162 N.J. 27 (1999). Nor do we conclude the

24

testimony substantially prejudiced co-defendants or led the jury to an unjust result.

We now examine each defendant's arguments asserting errors requiring remand and resentencing. McDuffie challenges the sentences imposed a five-year term, subject to a two and one-half year term of parole ineligibility for the burglary count one; a discretionary extended ten-year term with a five-year period of parole ineligibility on the third-degree burglary conviction in count two, to be served consecutive to the sentence in count one; and a consecutive six-month term for resisting arrest in count twenty — were insufficiently supported. Not only does defendant assert the judge erroneously applied aggravating factor two, (gravity and seriousness of harm inflicted on the victim), a point conceded by the State, he also argues findings underpinning the imposition of the discretionary extended term were not fully articulated, see State v. Dunbar, 108 N.J. 80, 89 (1987) (delineating a four-part test when imposing a discretionary extended term sentence), then double counted when applying aggravating factors three (risk of re-offense), six (extent of prior record) and nine (need for deterrence), N.J.S.A. 2C:44-1(a) (3), (6), (9). McDuffie also challenges the support for imposing consecutive sentences as flawed and insufficient. See State v.

<u>Yarbough</u>, 100 <u>N.J.</u> 627, 643-45 (1985), <u>cert. denied</u>, 475 <u>U.S.</u> 1014, 106 <u>S. Ct.</u> 1193, 89 <u>L. Ed.</u> 2d 308 (1986).

After merger, Chance was sentenced to an aggregate term of seventeen years in prison: four years for the two burglaries in counts one and two, each subject to a two-year period of parole disqualification to run consecutive to each other; nine years for eluding in counts three, four and five, with a four-year period of parole ineligibility, concurrent to each other and consecutive to counts one and two, and eighteen months for counts six, seven, and eleven, aggravated assault of police officers, to run concurrent to count one.

The judge imposed applicable fines and penalties. Further, he ordered each defendant to pay significant restitution.

Though it maintains the errors are not fatal, and urges the sentences be affirmed, the State concedes the trial court failed to articulate its reasons for imposing consecutive, rather than concurrent sentences. The State also agrees aggravating factor two was inapplicable despite the judge's statements.

> The role of appellate courts in reviewing
> sentences is to determine: (1) whether the
> exercise of discretion by the sentencing court
> was based upon findings of fact grounded in
> competent, reasonably credible evidence; (2)
> whether the sentencing court applied the
> correct legal principles in exercising its
> discretion; and (3) whether the application

> of the facts to the law was such a clear error of judgement that it shocks the conscience.
>
> [State v. Megargel, 143 N.J. 484, 493 (1996) (citing State v. Roth, 95 N.J. 334, 363-65 (1984)).]

In this matter, the trial court's sentencing findings were less than thorough. The judge merely recited aggravating and mitigating factors he applied, and make findings only regarding aggravating factor two, which the State concedes, and we agree, does not apply.

First, we reject, as lacking merit, McDuffie's claim the court impermissibly double-counted his criminal record, when granting the State's motion for a discretionary extended term, and again, when imposing aggravating factor six, which considers the extent and seriousness of a defendant's prior record. "[F]acts that establish[] elements of a crime for which a defendant is being sentenced should not be considered as aggravating circumstances in determining that sentence." State v. Kromphold, 162 N.J. 345, 353 (2000) (citation omitted). McDuffie's criminal history was not a "fact" that was a necessary element of an offense for which he was being sentenced. Further, it cannot be disputed McDuffie had more than the requisite number of offenses to qualify for an extended term. Indeed, the trial judge was not then

27

required to ignore the extent of his criminal history when considering applicable aggravating factors.

Second, we do agree with co-defendants' arguments stating the lack of expressed findings when imposing consecutive rather than concurrent sentences require the sentences be vacated and the matter remanded for resentencing. Even though the decision to impose a consecutive sentence lies within a judge's discretion, the reasons for doing so cannot be assumed and must be stated. State v. Miller, 108 N.J. 112, 122 (1987). A remand for resentencing is required when the court fails to set forth a separate statement of reasons for imposing consecutive sentences. See State v. Abdullah, 184 N.J. 497, 514-15 (2005) ("[B]ecause the trial court did not explain why it imposed consecutive sentences, we are compelled to remand for the court to place its reasons on the record.").

Here, rigorous arguments on this aspect of sentencing were advanced by the State and on behalf of defendants. A remand might be avoided if the "sentencing transcript makes it possible to 'readily deduce' the judge's reasoning." State v. Miller, 205 N.J. 109, 129-30 (2011) (quoting State v. Bieniek, 200 N.J. 601, 609 (2010)). However, this is not such a record. We cannot glean from the judge's limited comments what findings he relied upon. More significantly, the judge summarily stated the "analysis will

28

be the same for both defendants." This "one size fits all analysis" falls short of the specific findings required when imposing sentencing.

Finally, the State agrees the judge "improperly imposed separate [Victims of Crime Compensation Board] fees and [Safe Neighborhood Service Fund] penalties on the merged convictions."

In summary, we affirm the convictions imposed for each defendant. However, we are constrained to vacate the sentences and remand for the court to set forth reasons for the application of aggravating and mitigating factors, the basis for rejecting argued mitigating factors, and for the imposition of the consecutive sentences. The judgment of conviction must also be corrected as to assessed fines and penalties.

Affirmed in part and reversed and remanded in part for resentencing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1344-14T2