**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5556-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

HAKEEM S. GAMBLE,
a/k/a DAVID A. JOHNSON,
and MARK D. HARVEY,

     Defendant-Appellant.

_____

Argued September 13, 2021 – Decided September 23, 2021

Before Judges Fasciale and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 16-04-0294.

Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Morgan A. Birck, of counsel and on the brief).

Amanda G. Schwartz, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck,

Acting Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant appeals from his convictions for third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1); and third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1).[1]

On appeal, defendant raises the following arguments for this court's consideration:

POINT I

THE TRIAL [JUDGE] ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS BECAUSE THE STOP WAS UNSUPPORTED BY REASONABLE, ARTICULABLE SUSPICION, AND THE SUBSEQUENT QUESTIONING, REQUEST FOR CONSENT TO SEARCH, AND CANINE SNIFF PROLONGED THE MOTOR VEHICLE STOP WITHOUT REASONABLE SUSPICION. U.S.

---

[1] A grand jury indicted and charged defendant with third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1) (Count One); third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(b)(3) (Count Two); second-degree possession with intent to distribute within 500 feet of a public park; N.J.S.A. 2C:35-5(a), N.J.S.A. 2C:35-7.1(a) (Count Three); third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (Count Four); third-degree possession with intent to distribute cocaine, N.J.S.A. 2C:35-5(b)(3) (Count Five) ; and second-degree possession with intent to distribute cocaine within 500 feet of a public park, N.J.S.A. 2C:35-5(a), N.J.S.A. 2C:35-7.1(a) (Count Six). The judge granted defendant's motion for acquittal on counts three and six, and the jury was deadlocked on counts two and five.

CONST. AMEND. IV; N.J. CONST. ART. I, ¶ 7. (Raised below).

A. The [S]top [W]as [N]ot [S]upported [B]y [R]easonable [S]uspicion [T]hat [A] [M]otor [V]ehicle [O]ffense [W]as [B]eing [C]ommitted. (Raised below).

    1. The license plate did not violate N.J.S.A. 39:3-33 and thus did not provide reasonable suspicion to stop defendant. (Raised below).

    2. The license suspension did not provide a sufficient alternate basis for the stop. (Raised below).

B. Even [I]f [T]he [O]fficer [H]ad [R]easonable [S]uspicion [F]or [T]he [I]nitial [S]top, [T]his [C]ourt [S]hould [S]till [S]uppress [B]ecause [T]he [O]fficer [P]rolonged [T]he [S]top [W]ithout [T]he [R]equisite [R]easonable [S]uspicion [T]o [D]o [S]o. (Raised below).

    1. The officer extended the scope of the stop beyond the time necessary to address the traffic violations. (Raised below).

    2. The officer impermissibly extended the scope of the stop without the requisite reasonable suspicion to do so. (Raised below).

C. Even [I]f [T]his [C]ourt [D]oes [N]ot [S]uppress [T]he [D]rugs, [I]t [S]hould [R]emand [F]or [A] [H]earing [A]nd

3

[D]ecision [U]nder the [C]orrect [L]egal [S]tandard. (Raised below).

POINT II

THE TRIAL [JUDGE] ERRED BY NOT ISSUING A CLAWANS[2] INSTRUCTION AFTER THE STATE FAILED TO CALL OFFICER THOMAS MCWAIN TO TESTIFY AT TRIAL REGARDING THE CHAIN OF CUSTODY OF THE DRUGS. (Raised below).

POINT III

THE SENTENCE IS EXCESSIVE BECAUSE THE TRIAL [JUDGE] ENGAGED IN DOUBLE COUNTING AND IMPROPERLY FOUND DEFENDANT'S DRUG ADDICTION AS AN AGGRAVATING FACTOR. (Not raised below).

Based on recent case law, we disagree with defendant that the obstructed license plate—on its own—was an insufficient basis to pull him over. But even if that were the case, the officer had an unrelated independent basis to do so. We further disagree with defendant's remaining contentions and affirm.

I.

On review of a motion to suppress evidence, we "defer[] to the trial [judge's] factual findings, upholding them 'so long as sufficient credible evidence in the record supports those findings.'" In Interest of J.A., 233 N.J.

---

2 State v. Clawans, 38 N.J. 162 (1962).

A-5556-18

432, 445 (2018) (quoting State v. Gonzales, 227 N.J. 77, 101 (2016)). We afford deference because the judge's factual determinations "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing [judge] cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Reversal is warranted only when the judge's determination is "so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, 42 N.J. at 162). A "trial [judge's] interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee the right to be free from unreasonable searches and seizures. State v. Nelson, 237 N.J. 540, 552 (2019) (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). "Those provisions impose a standard of reasonableness on the exercise of discretion by government officials to protect persons against arbitrary invasions." Ibid. (quoting State v. Maristany, 133 N.J. 299, 304 (1993)).

"Motor vehicle stops are seizures for Fourth Amendment purposes." State v. Atwood, 232 N.J. 433, 444 (2018). "An officer does not need a warrant to make [an investigatory] stop if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Birkenmeier, 185 N.J. 552, 561-62 (2006) (alteration in original) (quoting State v. Rodriguez, 172 N.J. 117, 126-27 (2002)). "It is firmly established that a police officer is justified in stopping a motor vehicle when he has an articulable and reasonable suspicion that the driver has committed a motor vehicle offense." State v. Locurto, 157 N.J. 463, 470 (1999) (quoting State v. Smith, 306 N.J. Super. 370, 380 (App. Div. 1997)). The State bears the burden of demonstrating by a preponderance of the evidence that it possessed sufficient information giving rise to the required level of suspicion. State v. Pineiro, 181 N.J. 13, 19-20 (2004).

A.

Officer Steven Flannery noticed defendant, who he knew, driving in West Deptford Township. Flannery had known him because a few months prior, defendant was a target of a separate investigation that Flannery was involved in, involving a tip that defendant was delivering narcotics. As part of defendant's motion to suppress, Flannery indicated he was "familiar with [defendant]

through prior police contacts" and was "aware that [defendant's] New Jersey driver's license was suspended." Specifically, two weeks earlier, Woodbury City Police had stopped defendant, wrote him a ticket for driving with a suspended license, and informed Flannery of the stop. At that time, Flannery learned that defendant's license had been suspended, and observed his driver's license photo.

For the stop in question, Flannery followed defendant and, using his mobile data terminal (MDT), checked if defendant's driver's license was still suspended. Flannery observed a rear license plate bracket covering the words "Garden State" on the license plate. Based on his knowledge of the suspended license and the license plate covering, Flannery pulled him over.

Flannery asked defendant for his license, registration, and insurance. Defendant stated that he did not have his license on him and he admitted that it had been suspended, but provided Flannery with the vehicle's registration and insurance cards. While speaking to him, defendant appeared "to be extremely nervous by avoiding eye contact, fumbling his documents in his hands, and he began to breathe rapidly in an apparent change of breathing pattern." Defendant also began to reach into the center console several times "as if he was attempting to conceal a weapon or contraband."

During this time, K-9 Sergeant Franks arrived on the scene. Flannery went back to his vehicle to check for active warrants, during which time he learned that defendant had no active warrants, confirmed that defendant's driver's license was suspended, and discovered that defendant had an "extensive history of narcotics arrests."

Flannery returned to the vehicle and requested defendant exit so he could speak to him further. As defendant exited, Flannery observed a white pill bottle in the driver's side door pocket. Because of defendant's "nervous indicators, his own acknowledgment of prior drug arrests, and an unknown prescription bottle in the vehicle," Flannery asked defendant for written consent to search his vehicle. Flannery read defendant the consent form, and defendant refused to consent. Flannery advised defendant that Sergeant Franks would have his K-9 partner conduct a free air sniff. Then, the free air sniff revealed that drugs were in the vehicle. As a result, Flannery requested a tow to impound the vehicle and applied for a search warrant.

A judge authorized the warrant, and officers searched the car. They found three sandwich bags containing narcotics in the gas cap: one containing fifty-eight bags of heroin, a second containing four bags of heroin, and a third containing thirty-six bags of crack cocaine. At this point, Patrolman Thomas

A-5556-18

McWain transported the drug evidence to the lab, where it was logged and processed.

On defendant's motion to suppress, he argued there was no justification for the motor vehicle stop, that it was unconstitutional for Flannery to order defendant out of the vehicle, that the length and duration of the stop were unreasonable, and that there was no probable cause to issue a search warrant. The judge denied defendant's motion finding Flannery's knowledge of defendant's license suspension and defendant's partial license plate covering provided reasonable articulable suspicion for the stop; that defendant's nervous appearance and Flannery's observation of a prescription pill bottle in the vehicle furnished reasonable suspicion to extend the stop; and that defendant made no showing of falsity or reckless disregard for the truth to warrant a Franks[3] hearing. Defendant filed a motion for reconsideration and a motion to recuse the judge. The judge denied both motions, entered orders, and rendered written decisions.

Following the Supreme Court's decision in State v. Atwood, 232 N.J. 433 (2018), defendant filed a second motion for reconsideration. Based on Atwood, the judge granted the motion for reconsideration and scheduled an N.J.R.E. 104

---

[3] Franks v. Delaware, 438 U.S. 154 (1978).

hearing before opening arguments to determine the validity of the motor vehicle stop. The judge found Flannery to be credible. As to the second reconsideration motion, the judge issued a written decision, again denying defendant's motion to suppress, and held that Flannery's prior knowledge of defendant's suspended license and defendant's partially covered license plate were individually sufficient to justify the stop. The judge, once again, found reasonable suspicion to extend the stop beyond its initial scope.

B.

We reject defendant's argument that his partially covered license plate did not solely provide Flannery reasonable suspicion that he was committing a traffic offense under, N.J.S.A. 39:3-33, which provides in part as follows: "No person shall drive a motor vehicle which has a license plate frame or identification marker holder that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate[.]"

In State v. Roman-Rosado, police pulled over the defendant's vehicle for violating N.J.S.A. 39:3-33 because the license plate frame on the rear of the car touched the bottom ten to fifteen percent of the words "Garden State" on the license plate. 462 N.J. Super 183, 190-91 (App. Div. 2020). When it was revealed that there were outstanding warrants for his arrest, the officer searched

10

the car and found an unlicensed firearm. Id. at 191-92. The defendant moved to suppress the evidence, and the judge denied the motion. Id. at 192. The judge acknowledged that there were minimal obstructions to the plate but found that the statute barred the obstruction of any marking on the plate. Ibid. This court reversed, finding that the plate's markings were not concealed or obscured within the meaning of the statute. Id. at 190. This court found there was no reasonable basis for the police to stop defendant's car, that the subsequent search of the car was unconstitutional, and that the judge should have suppressed the firearm. Id. at 199-200.

After briefing concluded in this appeal, the Court handed down its opinion in State v. Roman-Rosado, ___ N.J. ___ (2021).[4] The Supreme Court upheld this court's decision, interpreted the statute narrowly, and held that N.J.S.A. 39:3-33 requires that "all markings on a license plate be legible or identifiable." Id. at ___ (slip op. at 4). The Court explained that:

> if a frame conceals or obscures a marking in a way that
> it cannot reasonably be identified or discerned, the
> driver would be in violation of the law. In practice, if
> a registration letter or number is not legible, the statute
> would apply; but if a phrase like "Garden State" is

---

[4] The case involved the consolidated appeals of Roman-Rosado and State v. Carter, ___ N.J. ___ (2021), both of which involved a defendant stopped for alleged license plate statute violations.

partly covered but still recognizable, there would be no violation.

[Id. at __ (slip op. at 4-5).]

In Roman-Rosado's case, the frame did not cover "Garden State" but only partially encumbered on ten to fifteen percent of the slogan. Id. at ___ (slip op. at 5). The Court, therefore, found the stop unlawful. Ibid. The Court then contrasted this with Carter's case, where the Court found a violation of the traffic statute where the license plate frame covered the phrase "Garden State" entirely. Ibid. The Court noted, "if 'Garden State,' 'New Jersey,' or some other phrase is covered to the point that the phrase cannot be identified, the law would likewise apply." Id. at ___ (slip op. at 29).

Here, the judge found Flannery credible and found that a partial covering was a sufficient basis to stop defendant. Flannery stated that as he pulled behind defendant, he noticed the words "Garden State" on defendant's license plate were partially covered.[5] He again noted that defendant's "rear license plate bracket was covering the license plate partially."

Under Roman-Rosado, a partial covering may not be a sufficient basis to stop defendant if the partially covered marking is still legible, however, the

_____

[5] A redacted photo of the license plate and frame appear at Appendix A.

defendant's license plate here is closer to Carter than Roman-Rosado. The State provided a picture of the defendant's license plate, which shows the bottom of the license plate frame covers nearly the entire "Garden State" marking. The covering makes the marking illegible. Under Carter, the defendant's near-total obstruction of the marking "Garden State" is a violation of N.J.S.A. 39:3-33 and provided Flannery with a sufficient basis for the motor vehicle stop.

C.

In the alternative, we also reject defendant's argument that Flannery's knowledge of defendant's license suspension did not provide an independent sufficient alternate basis for the motor vehicle stop.

Flannery testified that as he was driving behind defendant, he remembered the fourteen-digit number on defendant's license and typed it into his MDT to confirm that defendant's license was suspended. Defendant concedes that the information from the MDT would likely provide reasonable suspicion for the stop but maintains that "Flannery's assertion that he typed in [defendant's] letter-plus-fourteen-digit driver's license number from memory was patently incredible." Defendant contends that there was no lawful basis on the record to stop defendant as "the only information Flannery had about [defendant's] license

13

suspension was at least two weeks old and from second-hand knowledge of a stop a month prior."

This court has "determined that license plate checks followed by motor vehicle stops based on reasonable suspicion that the driver's license is suspended are constitutionally permissible in light of the interests at stake." State v. Pitcher, 379 N.J. Super. 308, 314 (App. Div. 2005). The only question we must address is "whether the officer's suspicion was reasonable. Specifically, [we] must consider whether the facts available to the officer 'at the moment of seizure,' were sufficient to cause a person of reasonable caution to believe that defendant was driving without a license." Id. at 315 (citing Pineiro, 181 N.J. at 21).

The judge found Flannery credible and that his testimony established he had reasonable suspicion to pull defendant over for driving with a suspended license. The facts in the record support the judge's conclusion. Flannery had previous knowledge that, as of two weeks prior, defendant's license was suspended. Moreover, the officer used his MDT to confirm that defendant's license was suspended before executing the stop. Even if, as defendant contends, the entry was not plausible and Flannery could not confirm the suspension in this manner, we conclude that his previous knowledge that

14

defendant's license was suspended provided ample reasonable suspicion for the stop. The stop was, therefore, also lawful on this alternate basis.

D.

We reject defendant's contention that the judge erred in failing to find that the scope of the stop had been extended without the requisite reasonable suspicion.

During a lawful traffic stop, a police officer can "inquire 'into matters unrelated to the justification for the traffic stop,'" State v. Dunbar, 229 N.J. 521, 533 (2017) (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)), and "may make 'ordinary inquiries incident to [the traffic] stop,'" ibid. (alteration in original) (quoting Rodriguez v. United States, 575 U.S. 348, 355 (2015)). "If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" State v. Dickey, 152 N.J. 468, 479-80 (1998) (alteration in original) (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir. 1995)).

"[A] canine sniff is sui generis and does not transform an otherwise lawful seizure into a search that triggers constitutional protections." Nelson, 237 N.J. at 553 (alteration in original) (quoting Dunbar, 229 N.J. at 538). Therefore, "an

15

officer does not need reasonable suspicion independent from the justification for a traffic stop . . . to conduct a canine sniff." Ibid. (quoting Dunbar, 229 N.J. at 540). "However, 'an officer may not conduct a canine sniff in a manner that prolongs a traffic stop beyond the time required to complete the stop's mission, unless he possesses reasonable and articulable suspicion to do so.'" Ibid. (quoting Dunbar, 229 N.J. at 540).

On defendant's first motion to suppress, the judge made the following findings of fact:

> Initially, when speaking with [d]efendant, Officer Flannery indicated that [d]efendant appeared to be extremely nervous by avoiding eye contact, fumbling his documents in his hands, and he began to breathe rapidly in an apparent change of breathing pattern. Defendant also began to reach in the center console several times after providing Officer Flannery with the requested documents, as if he was attempting to conceal a weapon or contraband. When [d]efendant was exiting the vehicle as requested, Officer Flannery observed a prescription pill bottle but did not see the name of who it was prescribed to.

Based on these factual findings, the judge concluded that "under the totality of the circumstances, [Flannery] provided reasonable suspicion to extend the stop due to possible offenses unrelated to the initial stop." The judge further found that "[b]ecause there was reasonable and articulable suspicion to extend the inquiry of the motor vehicle stop, it can also be said that there was reasonable

16

and articulable suspicion for Officer Flannery to request [d]efendant's consent to search his vehicle and for him to request a canine to report to the scene."

The judge's finding that Flannery had reasonable suspicion to extend the stop is supported by sufficient credible evidence in the record. Flannery knew defendant was previously part of an investigation involving narcotics and confirmed that defendant had an "extensive history of narcotics arrests." We conclude that this information, coupled with defendant's visible nervousness, his reaching into the center console, and the prescription pill bottle justified the extension of the stop.

II.

We reject defendant's argument that the judge erred by not issuing a Clawans instruction because McWain was a crucial link in the chain of custody of the drugs recovered from defendant's car, and the failure to call him or provide an adverse inference denied defendant a fair trial.

A Clawans charge, or adverse inference instruction, is grounded in the principle that a "failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him [or her]." Clawans, 38 N.J. at 170. When deciding whether to give a

17

Clawans charge, the trial judge must place on the record findings on each of the following:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue [;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [State v. Hill, 199 N.J. 545, 561-62 (2009) (alteration in original) (citing State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

Relevant to this appeal, "where a witness invokes his Fifth Amendment privilege and refuses to testify, he is unavailable to both parties and no adverse inference can fairly be drawn by virtue of his [or her] nonproduction." State v. Crews, 208 N.J. Super. 224, 230 (App. Div. 1986).

After defendant's vehicle was impounded, Flannery searched the car, which revealed drugs in the vehicle's gas cap. After the drugs were found, McWain delivered them from the police department to the New Jersey State Police Laboratory. Karen Creel, a clerk typist and evidence handler at the drug lab, testified about receiving the evidence from McWain. She testified that

officers "pre-log their evidence into . . . the computer system," and when evidence is brought to the lab, she opens their pre-log and "pull[s] up one case at a time" and logs the evidence. From this, Creel generated an evidence receipt. Mandelle Hunter, a forensic scientist at the Office of Forensic Sciences, attested that once an evidence clerk brings up the information on the pre-log, she gives the evidence a laboratory case number, ensures that the evidence matches the log, and then seals and labels it.

Here, defendant requested a <u>Clawans</u> charge because McWain, who brought the drug evidence to the lab, did not testify because he was under indictment for official misconduct involving drug evidence tampering. The judge denied the request, reasoning that McWain was equally not available to both parties. The judge noted that McWain's "current status as a charged defendant . . . makes him unavailable because he has the right to assert the Fifth." The judge found that McWain "would have a Fifth Amendment right, given the circumstances, and is likely to take that or assert that right." The judge also explained that the State would have had to disclose any known information that would tie McWain's pending charge to the activity in this case because of the State's <u>Giglio</u>[6] obligation. The judge, therefore, found that the testimony of

---

[6] <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

Creel, who testified that she received the evidence in an untampered condition, consistent with the pre-log information, sufficiently established the chain of custody and allowed the jury to assess the credibility of the evidence properly.

The judge pointed out that the lab received the evidence in an untampered condition, which matched the evidence receipt. The judge properly noted that if McWain were asked whether he tampered with evidence in this case, he would more likely than not plead the Fifth, making him entirely unavailable to both parties. Moreover, defendant made no showing that McWain's testimony would have been superior to the testimony of Creel and Hunter or that tampering was even at issue in the case. See Hickman, 204 N.J. Super. at 414. Because the testimony of Creel and Hunter sufficiently established the chain of custody and McWain was unavailable, the judge did not err in refusing to issue a Clawans charge.

## III.

We review sentencing determinations in accordance with a deferential standard and "must not substitute [our] judgment for that of the sentencing [judge]." State v. Fuentes, 217 N.J. 57, 70 (2014). We determine whether "sentencing guidelines were violated"; whether "the aggravating and mitigating factors found" were "based upon competent and credible evidence in the record";

20

and whether "the application of the guidelines to the facts of [the] case make[] the sentence clearly unreasonable so as to shock the judicial conscience." Ibid. (first alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"Under N.J.S.A. 2C:44-3, the [judge] may, on application by the prosecutor, sentence a first-, second-, or third-degree offender to an extended term, but only if [the judge] finds that the defendant is either (1) a persistent offender, (2) a professional criminal, or (3) a hired criminal." Dunbar, 108 N.J. at 87-88. "The sentencing [judge] must first, on application for discretionary enhanced-term sentencing under N.J.S.A. 2C:44-3(a), review and determine whether a defendant's criminal record of convictions renders him or her statutorily eligible." State v. Pierce, 188 N.J. 155, 168 (2006). If so, then "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." Id. at 169. "Thereafter, whether the [judge] chooses to use the full range of sentences opened up to the [judge] is a function of the [judge's] assessment of the aggravating and mitigating factors, including the consideration of the deterrent need to protect the public." Id. at 168.

> Where, within that range of sentences, the [judge]
> chooses to sentence a defendant remains in the sound
> judgment of the [judge]—subject to reasonableness and
> the existence of credible evidence in the record to

support the [judge's] finding of aggravating and mitigating factors and the [judge's] weighing and balancing of those factors found.

[Id. at 169.]

Based on his age and criminal history, the judge found defendant met the minimum statutory requirements as a persistent offender under N.J.S.A. 2C:44-3 and, therefore, eligible for an extended term.

The judge recounted that defendant was thirty-five years old when he committed the offense. The judge reviewed defendant's criminal history, which included: a third-degree theft offense conviction with a three-year prison term when he was eighteen; a third-degree possession with the intent to distribute offense with a three-year prison term with a one year period of parole ineligibility when he was twenty; a third-degree possession of CDS conviction with a five-year term of probation with 364 days in the county jail when he was twenty-five; a fourth-degree resisting conviction with a five-year term of probation with 364 days in the county jail when he was twenty-five; and a third-degree resisting conviction with drug court special probation for five years which he violated and received a five-year prison term with a one year period of parole ineligibility when he was twenty-six. The judge stated, "a sentence with an extended term is appropriate given . . . defendant's very, very lengthy criminal

22

history."  As a result, defendant's potential exposure was a minimum of three years to a maximum of ten years of incarceration.

Ascribing substantial weight to the aggravating factors, the judge noted that defendant's criminal history showed he was an adjudicated delinquent fifteen times, had three temporary restraining orders filed against him, thirty-two disorderly persons convictions, six felony convictions, and four probation violations.  The judge found and gave weight to the following factors: the risk that defendant will reoffend, N.J.S.A. 2C:44-1(a)(3); the extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted, N.J.S.A. 2C:44-1(a)(6); and the need for deterrence, N.J.S.A. 2C:44-1(a)(9).  For aggravating factor three, the judge stated that defendant's "criminal history and substance abuse history suggests recidivism is likely."  For aggravating factor six, he found that "[t]he seriousness of his criminal activity will continue to match the seriousness of his substance abuse" and his criminal history "reflects a defiant, anti-social behavior."  The judge also gave significant weight to aggravating factor nine.

Defendant does not dispute his eligibility for extended term sentencing as a persistent offender or that his sentence falls within the permissible range. Instead, citing State v. Vasquez, 374 N.J. Super. 252, 267 (App. Div. 2005),

defendant essentially argues that using the same convictions as both a basis for finding a defendant should be sentenced to an extended term, as well as a basis for finding an aggravating factor to increase the length of a defendant's sentence, is prohibited double counting. In Vasquez, this court determined the sentencing judge erred in "rais[ing] the presumptive extended base term on account of defendant's only prior conviction, the very conviction which both allowed and required an extended term." Ibid. This court concluded "[t]o do so was a form of 'double-counting.'" Ibid.

However, in State v. Tillery, 238 N.J. 293, 327 (2019), the Court found "no error in the trial [judge's] reliance on defendant's criminal record both to determine defendant's 'persistent offender' status under N.J.S.A. 2C:44-3(a) and to support the [judge's] finding of aggravating factors three, six, and nine." Indeed, the Tillery Court confirmed that "the defendant's criminal record may be relevant in both stages of the sentencing determination" as "defendant's prior record is central to aggravating factor six, N.J.S.A. 2C:44-1(a)(6), and may be relevant to other aggravating and mitigating factors as well." Id. at 327-28. Likewise, in State v. McDuffie, 450 N.J. Super. 554, 576 (App. Div. 2017), this court rejected, "as lacking merit," a defendant's claim that "the court impermissibly double-counted his criminal record, when granting the State's

motion for a discretionary extended term, and again, when imposing aggravating factor six." This court explained that defendant's "criminal history was not a 'fact' that was a necessary element of an offense for which he was being sentenced." Id. at 576. The sentencing judge was not "required to ignore the extent of his criminal history when considering applicable aggravating factors," particularly where it was undisputed that defendant "had more than the requisite number of offenses to qualify for an extended term." Id. at 576-77.

Here, the record reflects the judge did not double-count the offense that triggered the extended term as an aggravating factor but rather found the aggravating factor based on competent credible evidence of defendant's criminal history. The judge emphasized that nothing had deterred defendant's criminal behavior in the past. Therefore, we conclude that the judge did not abuse his discretion.

We also reject defendant's contention that the judge focused on defendant's "criminal history alone," instead of "the offense itself" in violation of Dunbar, 108 N.J. at 91-92. In Dunbar, the Court explained that "[o]nce the decision to impose an extended term has been made, the [judge] should then return its focus primarily to the offense." Id. at 91. However, "other aspects of the defendant's record, which are not among the minimal conditions for

determining persistent offender status, such as a juvenile record, parole or probation records, and overall response to prior attempts at rehabilitation, will be relevant factors in adjusting the base extended term." Id. at 92. Here, the judge's consideration of other aspects of defendant's record belies defendant's contention.

Defendant's contention that the judge improperly used defendant's drug addiction as evidence of both aggravating factor three and aggravating factor six is also without merit. Defendant cites to State v. Baylass, 114 N.J. 169 (1989), to support his proposition that drug addiction cannot serve as a basis for aggravating factors. Baylass is distinguishable, however, because the issue was whether a violation of probation could constitute an aggravating factor. The defendant in Baylass was sentenced to probation for forgery but had violated it by continuing to use drugs and absconding. Id. at 171-72. During resentencing, the trial judge focused on the defendant's drug use, but the Supreme Court held that "a violation of probation relates to mitigating, not aggravating, factors as identified at a defendant's original sentencing hearing." Id. at 170. Baylass is, therefore, distinguishable, where defendant was not being sentenced on a violation of probation and his drug addiction was relevant to his likelihood to reoffend. There exists no error in the judge's acknowledgment that "the

seriousness of [defendant's] criminal activity will continue to match the seriousness of his substance abuse unless he seeks substantial and lasting treatment." Therefore, the judge properly found defendant extended term eligible as a persistent offender and considered and balanced the relevant aggravating, mitigating factors.

To the extent that we have not addressed defendant's arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-5556-18

## Appendix A



A-5556-18