**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2573-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTWON D. MCGRIFF,
a/k/a/ ANTWON MCGRIFF,

    Defendant-Appellant.

_____

Submitted February 8, 2021 – Decided April 27, 2021

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-08-0789.

Joseph E. Krakora, Public Defender, attorney for appellant (Morgan A. Birck, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Andre R. Araujo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

On August 30, 2017, defendant was charged in a seven-count indictment with first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1) (count one); second-, third-, and fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), (2), and (4) (counts two, three, and four, respectively); third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a) (count five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count seven). The trial court dismissed counts three and five on the State's motion prior to trial.

The charges stemmed from the non-fatal shooting of defendant's neighbor. During the seven-day jury trial beginning on October 24, 2018, the parties presented conflicting scenarios surrounding the circumstances of the shooting. The neighbor testified that defendant intentionally shot him because he owed defendant money for marijuana. In his statement to police, defendant admitted threatening his neighbor with a gun to scare him but claimed the gun accidentally discharged. According to defendant, his actions were prompted by the neighbor pointing a gun at his home the night before, while defendant's children were present, and running off before defendant could confront him.

A-2573-18

A jury convicted defendant of the weapon possession offenses (counts six and seven), and simple assault as a lesser included offense of count two. He was acquitted of the remaining charges. During the trial, both sides presented evidence that defendant, the victim, and the victim's stepfather who witnessed the shooting gave inconsistent statements. To that end, the State presented a letter signed by the victim recanting his identification of defendant as the shooter. Although the victim repudiated the content of the letter at trial, he admitted signing the letter in exchange for money offered by defendant's friend. At sentencing, defendant received an aggregate extended term of sixteen years' imprisonment, with an eight-year period of parole ineligibility.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE COURT'S ERRONEOUS ADMISSION OF OTHER-CRIMES EVIDENCE, INCLUDING A LETTER SIGNED BY THE VICTIM IN EXCHANGE FOR MONEY FROM DEFENDANT AND OF EVIDENCE THAT DEFENDANT WAS DEALING MARIJUANA TO THE VICTIM. N.J.R.E. 404(B); U.S. CONST. AMEND VI, XIV; N.J. CONST. ART. I, ¶ 1, 10. (NOT RAISED BELOW)
>
> . . . .
>
> [A.] The Letter The Victim Signed Saying Defendant Was Not The Shooter

A-2573-18

Was Inadmissible As N.J.R.E. 404(B)
Evidence And The Court's Failure To Give
A Limiting Instruction Was Highly
Prejudicial.

[B.] The Victim's Testimony About
Defendant Selling Him Drugs Was
Inadmissible As N.J.R.E. 404(B) Evidence
And The Court's Failure To Give A
Limiting Instruction Was Highly
Prejudicial.

[C.] The Failure To Give Any Limiting
Or Curative Instruction Necessitates
Reversal.

POINT II

THE PROSECUTOR COMMITTED REVERSIBLE
MISCONDUCT DURING SUMMATION BY
COMPARING THIS CASE TO THE INFAMOUS
TRAYVON MARTIN SLAYING BY GEORGE
ZIMMERMAN. U.S. CONST. AMEND V, XIV; N.J.
CONST. ART. I, ¶ 1, 9, 10.

POINT III

THE CUMULATIVE IMPACT OF THE OTHER-
CRIMES EVIDENCE AND THE PROSECUTORIAL
MISCONDUCT IN SUMMATION DEPRIVED
DEFENDANT OF DUE PROCESS AND A FAIR
TRIAL. U.S. CONST. AMEND V, VI, XIV; N.J.
CONST. ART. I, ¶ 1, 9, 10.

POINT IV

THIS COURT SHOULD REMAND FOR
RESENTENCING BECAUSE THE SENTENCING

4

COURT ENGAGED IN IMPROPER DOUBLE COUNTING AND IMPROPERLY FAILED TO FOCUS ON THE OFFENSE WHEN SENTENCING DEFENDANT TO THE UPPER END OF THE DISCRETIONARY EXTENDED TERM RANGE.

> A. The Sentencing Court Engaged In Double-Counting When It Used [Defendant's] Only Two Indictable Convictions To Both Apply The Extended Term And To Weigh Aggravating Factor Six With "Substantial Weight."
>
> B. The Sentencing Court Failed To Consider The Offense Itself When Deciding.

For the reasons that follow, we affirm.

## I.

We glean these facts from the trial record. At approximately 10:00 a.m. on January 25, 2016, defendant ran up to his neighbor, Victor Bernal, who was seated in a car in front of Bernal's mobile home located in the Country Meadows Trailer Park, pounded the butt of a handgun three times on the window of Bernal's car, and then fired the gun into the vehicle, wounding Bernal. Afterwards, defendant "took off running towards his trailer" across the street. Police and emergency medical services (EMS) responded to the 911 calls.[1]

---

[1] The 911 calls were played for the jury.

A-2573-18

Bernal was transported to Inspira emergency room where he was medivacked to AtlantiCare Regional Medical Center for treatment of a "gunshot wound . . . in his left back area." In the course of the investigation, police took statements from Bernal and Bernal's stepfather, Arturo Diaz, who was outside cleaning out his minivan at the time and witnessed the shooting. Police also located defendant at the trailer park, placed him under arrest, and questioned him after advising him of his rights.[2]

At trial, Bernal testified he was hospitalized "[f]or about two months" and would "be in pain for the rest of [his] life" from the injury. He stressed that the gun did not accidentally discharge because defendant "pointed [it] right at [him]" before firing. Bernal denied trying to break into defendant's mobile home the night before and testified that he had spent the night at his girlfriend's house. However, contrary to his statement to police, during his trial testimony, Bernal attributed defendant's motive for the shooting to the fact that he "owed [defendant about $200 or $300] for some weed."[3]

---

[2] At trial, the parties stipulated that defendant knowingly and voluntarily waived his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and gave a voluntary statement which was introduced at trial with redactions agreed to by both parties. No issues related to defendant's statement are raised in this appeal.

A-2573-18

During direct examination, when shown a letter dated September 19, 2017,[4] in which Bernal purportedly recanted his statement identifying defendant as the shooter, Bernal testified that although he "signed" the letter, he "did[ not] write it."[5] Although the letter contained the jurat of a notary public, Bernal denied appearing before the specified notary public and repudiated the content of the letter. Instead, Bernal testified he signed the letter at the behest of an unnamed friend of defendant "because [he] was supposed to get paid for [it]." Bernal explained that at the time, "[he] was on drugs" and "needed money." According to Bernal, he started using drugs after the shooting and was in jail at the time of the trial because he had pleaded guilty to a drug related charge.

During his testimony, Diaz corroborated Bernal's account of the shooting. However, on cross-examination, when confronted with his statement to police, Diaz denied that he had told police that during the shooting, defendant had said

---

[3] During his statement to police, Bernal had denied owing defendant money for drugs and explained instead that he owed defendant money for "a loan."

[4] The letter was moved into evidence.

[5] To support his denial, Bernal pointed out that the letter incorrectly stated that the shooting occurred on January 24, rather than January 25. Bernal said if he had written the letter, he would not have made that mistake.

A-2573-18

to Bernal, "this is for last night." Diaz also testified that he had no problems with defendant prior to the shooting.

In his statement to police, after initially denying any involvement in the shooting, defendant ultimately admitted threatening Bernal with the gun in retaliation for him and his brother "try[ing] to kick [his] door in" and "pointing" "two" "sawed off" shotguns at his home the night before while defendant's family was present.[6] According to defendant, when he called out Bernal's name, Bernal "just took off running." Defendant stated that when he confronted Bernal in the car the following morning, he only intended to "scare[] him up." However, the gun "went off by accident" when he "tried to . . . bust [t]he [car] window out"[7] by hitting the gun against the vehicle. Defendant claimed that after the gun discharged, he "got scared," "dropped it right there," and ran off.

Police never recovered the weapon. However, a record check revealed that defendant did not have a permit to carry a firearm in New Jersey.

---

[6] Defendant explained that the disagreement between the two families began about a month before when he refused to pay Diaz $500 for a botched repair of defendant's car. In response, Diaz had allegedly threatened defendant that he could "make a call" because "his sister [was] in the Cartel." During cross-examination, Diaz acknowledged doing repairs on defendant's car but testified that he was paid for the job and that defendant was satisfied with the work.

[7] In his statement to police, Bernal confirmed that during the confrontation, defendant had said "fuck that, I'm about to bust the windows."

8

Defendant did not testify at trial. The jury returned its verdict on November 8, 2018, and defendant was sentenced on January 4, 2019. The judge entered a conforming judgment of conviction on January 8, 2019, and this appeal followed.

## II.

On appeal, defendant argues for the first time in Point I that "the court erroneously admitted [the recantation] letter that Bernal said he signed in exchange for [money]" and "allowed Bernal to testify that [defendant] sold drugs to Bernal." Defendant asserts that the former "implied that [defendant] was involved in witness tampering, or bribing a witness to cover up any involvement in a crime" and the latter "painted [defendant] as a drug dealer." Defendant argues that by "admit[ing] this evidence absent any analysis required under N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328 (1992)," and "failing to give the jury any limiting instruction," the court "deprived [defendant] of his right to due process and a fair trial." According to defendant, in addition to the fact that the State failed to give the requisite "notice as to what th[e] evidence would be used for," had "the Cofield analysis . . . been done, the evidence should have been excluded because in both cases the evidence was not proven by clear and convincing evidence, and . . . the prejudice outweighed its probative nature."

Because there was no objection at trial, we review this issue to determine whether there was plain error, which is error that "is 'clearly capable of producing an unjust result.'" State v. Singleton, 211 N.J. 157, 182-83 (2012) (quoting R. 2:10-2). Under the plain error standard, "the possibility of injustice [must be] 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). When a defendant does not object, our Supreme Court "has held [that] 'to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Weston, 222 N.J. 277, 294-95 (2015) (quoting Macon, 57 N.J. at 333). Thus, "[i]t is defendant's burden to demonstrate that the trial courts' procedures constituted plain error." Id. at 295. In determining whether the defendant has met his burden, "we assess the overall strength of the State's case." Ibid. (citations and quotation marks omitted). See State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction given strength of evidence against defendant despite admission of improper expert testimony).

Generally, N.J.R.E. 404(b) precludes the admission of evidence pertaining to other crimes or wrongs, except to show "proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute."  Indeed, "N.J.R.E. 404(b) is a rule of exclusion rather than a rule of inclusion. . . ."  State v. Carlucci, 217 N.J. 129, 140 (2014) (quoting State v. P.S., 202 N.J. 232, 255 (2010)).

In Cofield, the Supreme Court articulated a four-pronged test to govern the admissibility of such evidence for those permitted purposes.  127 N.J. at 338. Specifically, the Cofield test requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [State v. Williams, 190 N.J. 114, 122 (2007) (quoting Cofield, 127 N.J. at 338).]

In Williams, however, the Court observed that because the second Cofield factor was "not one that [could] be found in the language of . . . Rule 404(b)," it "need not receive universal application in Rule 404(b) disputes."  Id. at 131.

A-2573-18

Here, we agree with defendant that the evidence in question fell within

N.J.R.E. 404(b)'s parameters and should therefore have been subjected to a

Cofield analysis.[8]  However, because defense counsel never objected during the

trial, the judge was never asked to perform the requisite analysis or give the jury

a Cofield limiting instruction, either at the time the evidence was introduced or

during the final instructions to the jury.  See State v. Marrero, 148 N.J. 469, 495

(1997) ("When other-crime evidence is admitted, 'the court must instruct the

jury on the limited use of the evidence.'"  (quoting Cofield, 127 N.J. at 340-41)).

Regardless of whether an appropriate objection would have led to the exclusion

of the evidence or the giving of limiting instructions, we are satisfied that given

the strength of the evidence against defendant, any error was not of "sufficient

[magnitude] to raise a reasonable doubt as to whether [it] led the jury to a result

it otherwise might not have reached."  Macon, 57 N.J. at 336.

To support our conclusion, we rely on the fact that defendant was

acquitted of the most serious charge and convicted of simple assault and two

---

[8]  We point out that, facially, the letter itself is exculpatory and referenced no crimes or bad acts committed by defendant.  Instead, it characterized defendant as "an innocent man" who "was not the shooter!"  However, we construe defendant's argument on appeal as challenging the testimony elicited from Bernal in connection with the letter rather than the letter itself, which content defense counsel would have undoubtedly used to undermine Bernal's conflicting trial testimony had it not been introduced by the State.

weapon possession offenses which were established by defendant's incriminating statement to police as well as the defense theory at trial. Indeed, in his statement, defendant admitted that he attempted to scare Bernal with a handgun in retaliation for Bernal threatening his family with a sawed-off shotgun over an unpaid mechanic's bill. However, the gun discharged accidentally, injuring Bernal. In summations, defense counsel reiterated that Bernal instigated the confrontation and defendant was "protect[ing] himself" and "his family" when he "rightly or wrongly had a handgun" that "malfunction[ed]" and accidentally discharged when he "bang[ed] th[e] gun against the [car] window." The verdict in this respect was consistent with defendant's account rather than the State's version of an unprovoked, pre-meditated intentional attempt to murder Bernal.

In Point II, defendant argues that during summations, the prosecutor's "comparison" of his case to "the Trayvon Martin/George Zimmerman case," "a notorious case" that "launched a movement for racial justice that continues today," was "both unsupported by the record and entirely inflammatory." Defendant asserts that the "prosecutor's use of Zimmerman . . . implie[d] that this case [was] even worse than the Zimmerman case, and that the failure to convict could appear widely as an injustice." Thus, the comments were "highly

13

prejudicial, and violated [his] rights to due process and [a] fair trial." Moreover, according to defendant, the prosecutor's "comparison between Florida and New Jersey law could have confused the jury."

Although prosecutors have considerable latitude in presenting closing arguments, they "may not exceed the parameters of 'permissibly forceful advocacy' established by decisional law." State v. Munoz, 340 N.J. Super. 204, 217 (App. Div. 2001) (quoting State v. Marshall, 123 N.J. 1, 161 (1991)). In that regard, courts have found prosecutorial comments to be improper in instances where the remarks made "references to matters extraneous to the evidence," State v. Jackson, 211 N.J. 394, 408 (2012), or "possess[ed] the capacity to anger and arouse the jury and thereby divert them from their solemn responsibility to render a verdict based on the evidence." Marshall, 123 N.J. at 161. "In other words, as long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. R.B., 183 N.J. 308, 330 (2005)), "[t]here is no error." Ibid. (alteration in original) (quoting State v. Carter, 91 N.J. 86, 125 (1982)). However, deviation from this path is problematic.

"Notwithstanding the high standard to which a prosecutor is held . . . , 'not every deviation from the legal prescriptions governing prosecutorial conduct'

requires reversal." Jackson, 211 N.J. at 408-09 (2012) (quoting State v. Williams, 113 N.J. 393, 452 (1988)). In fact, "[t]he misconduct does not warrant reversal unless it is 'so egregious that it deprived the defendant of a fair trial.'" Id. at 409 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). In determining whether a prosecutor's misconduct was sufficiently egregious to warrant reversal, "an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Frost, 158 N.J. at 83. "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Ibid. "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made" and "also deprives the court of an opportunity to take curative action." Id. at 84. "Notably, a determination as to whether a prosecutor's comments had the capacity to deprive defendant of a fair trial must be made 'within the context of the trial as a whole.'" McNeil-Thomas, 238 N.J. at 276 (quoting State v. Feaster, 156 N.J. 1, 64 (1998)).

Here, during her summation, in responding to defendant's self-defense claim, the prosecutor stated that "if [defendant] went and got his gun that night

when he [was] faced with an immediate threat, which he felt was made to his family or himself, then maybe we have a self-defense." However,

> [y]ou can't just go in your house, [thirteen] hours later, grab a deadly weapon, and confront someone. . . . And you definitely can't shoot someone for something that happened [thirteen] hours ago.
>
> Even in Florida, when we all know Florida has some crazy laws, because - - George Zimmerman, everybody knows that case. Stand your ground. . . . In Florida, if I perceive a threat, under their law, perceive a threat, not even an actual threat, I just say, oh, you know what, I felt threatened, like George Zimmerman said. You know, well, I see Trayvon Martin and I confront him, even though everybody said, don't walk up to him if you feel threatened, he engages Mr. Martin. They get into a physical scuffle, and Mr. Zimmerman shoots him.
>
> Well, in Florida, under their crazy system, that's legal. And we all . . . heard of stand your ground . . . .
>
> That's not what New Jersey says.

There was no objection when the comments were made. However, the following day, prior to the final jury charge, defense counsel objected to the prosecutor's "many references to stand your ground and Florida law" during closing and requested that "the jury be instructed to disregard [the comments] in [their] entirety." The judge denied defense counsel's request but stated that he was "going to instruct [the jurors] as to the law" that was applicable to the case,

16

and "remind them that any statements by any of the attorneys about what the law is, or should be or might be is to . . . be disregarded if it interferes or contradicts with the [judge's] charge." The judge determined "there [was] no reason . . . to do anything more specific than that." The judge's final charge included the explicit instructions he outlined in rejecting defense counsel's request.

On appeal, defendant essentially argues the denial of his request to strike the comments deprived him of a fair trial because the "comparison between Florida and New Jersey law could have confused the jury." We disagree. We are satisfied that the judge's instruction on the applicable law and the import of any contrary statements by the attorneys as to the applicable law sufficed to cure the error. "The authority is abundant that courts presume juries follow instructions." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019).

Turning to defendant's argument regarding the prosecutor's comparison of his case to "the Trayvon Martin/George Zimmerman case," because defendant did not object to those comments at trial, our review is subject to plain error scrutiny. See R. 2:10-2. Recently, our Supreme Court "reemphasized that prosecutorial misconduct warranting reversal of a defendant's conviction can be based upon references to matters extraneous to the evidence." State v. Williams, 244 N.J. 592, 612 (2021). There, based on prosecutorial misconduct, the Court

vacated the defendant's conviction for robbery, which stemmed from the defendant "pass[ing] a note to a young female teller which said, 'Please, all the money, 100, 50, 20, 10. Thank you.'" Id. at 599.

Noting that "[t]he central issue at trial" was whether defendant committed robbery or theft, the Court "consider[ed] whether the jury might have reached" its verdict

> because the prosecutor showed the jury a PowerPoint presentation in her closing that contained a still photograph from the movie The Shining and commented, "if you have ever seen the movie The Shining, you know how his face gets through that door." The PowerPoint slide depicted Jack Nicholson in his role as a violent psychopath who used an ax to break through a door while attempting to kill his family. The photograph contained the words spoken by Nicholson in the movie scene as he stuck his head through the broken door --"Here's Johnny!" The slide also bore the heading "ACTIONS SPEAK LOUDER THAN WORDS," a theme used by the State throughout the trial to suggest to the jury that defendant's conduct in the moments leading up to and following defendant's passing the note to the teller supported a finding of robbery when viewed in context. The photograph was not previously shown to the court or defense counsel and had not been used at trial or offered or admitted into evidence.
>
> [Id. at 599-600.]

The Court held that by "improperly invit[ing] a comparison between defendant and Jack Nicholson's psychotic, ax-wielding character in The

18

Shining," id. at 614, none of which was in evidence, "the prosecutor's comments and use of the PowerPoint slide amounted to prejudicial error." Id. at 600. The Court explained "[t]he use of a sensational and provocative image in service of such a comparison, even when purportedly metaphorical, heightens the risk of an improper prejudicial effect on the jury." Id. at 617. "Weighing 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial,' [the Court] determine[d] the prosecutor's comments and the extra-evidentiary movie photograph 'made it more likely that the jury would reject the defense' that only a theft occurred." Id. at 616. (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

Here, given the absence of any objection, we conclude that any error related to the prosecutor's comparison of defendant's case to the extra-evidentiary "Trayvon Martin/George Zimmerman case" was not of "sufficient [magnitude] to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 336. We are satisfied that in light of the evidence adduced at trial, particularly defendant's inculpatory statements, the prosecutor's comments, while completely inappropriate, did not deprive defendant of a fair trial. See Feaster, 156 N.J. at 63-64 ("We are fully satisfied that it was the weight of the evidence, particularly the damning

statements uttered by defendant himself, that led to this capital murder conviction rather than the prosecutor's improper comments during summation.").

"We also recognize that the prosecutor's summation is best reviewed within the context of the trial as a whole." Id. at 64. "Of particular relevance is the line of argument defense counsel pursued in summation," ibid., which harped on a theme of "two different jurisdictions . . . at play," "the law of the land" and "the law of the streets." Defense counsel implied that in order to survive at the trailer park, defendant could not abide by "the law of the land."[9] See State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011) ("A prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments."). Consistent with these principles, we conclude the objectionable comments, when viewed in context, do not rise to the level of plain error.

---

[9] Additionally, in explaining why defendant had not reported the attempted break-in by Bernal at his home the night before, defense counsel commented in summations that defendant would not "give anybody up," lest he suffer the same fate as "Whitey Bulger, who escaped the law for . . . [sixteen] years" but "[w]ithin [twelve] hours" of his transfer to a West Virginia prison, was "beaten to an unrecognizable mass." This reference by defense counsel to a different notorious case from another jurisdiction provides further context to the prosecutor's own reference.

In Point III, defendant argues that even if individually, "the other-crimes evidence and the prosecutorial misconduct in summation do not warrant reversal, in combination the errors 'cast sufficient doubt upon the verdict to warrant reversal.'" See State v. Reddish, 181 N.J. 553, 615 (2004) ("[W]e cannot excuse error on the basis of other overwhelming evidence of guilt when that other evidence also possesses the taint of error."). "We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008) (citing State v. Kosovich, 168 N.J. 448, 540 (2001)). However, here, because we conclude there were no reversible errors, defendant's cumulative error argument also fails.

Finally, in Point IV, defendant challenges his sentence as excessive. Specifically, defendant argues the judge engaged in "impermissible double-counting" by using his "only two prior indictable convictions to apply a discretionary extended term" and then use one of those prior convictions to enhance the weight of "aggravating factor six." Further, defendant asserts that "after deciding to apply an extended term," the judge erred by failing to "focus[]

upon the offenses for which [he] was being sentenced," thereby "ascrib[ing] duplicative and excessive emphasis to his record."

"[We] review sentencing determinations in accordance with a deferential standard," and "must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). In our review, we determine whether "sentencing guidelines were violated;" whether "the aggravating and mitigating factors found" were "based upon competent and credible evidence in the record;" and whether "'the application of the guidelines to the facts of [the] case make[] the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (first alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"The sentencing court must first, on application for discretionary enhanced-term sentencing under N.J.S.A. 2C:44-3(a), review and determine whether a defendant's criminal record of convictions renders him or her statutorily eligible." State v. Pierce, 188 N.J. 155, 168 (2006). If so, then "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." Id. at 169. "Thereafter, whether the court chooses to use the full range of sentences opened up to the court is a function of the court's assessment of the aggravating

and mitigating factors, including the consideration of the deterrent need to protect the public." Id. at 168.

> Where, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court--subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found.
>
> [Id. at 169.]

Here, the judge found defendant met "the minimum statutory requirements as a persistent offender . . . under [N.J.S.A.] 2C:44-3(a) and an extended term [of imprisonment was] applicable." The judge also noted that counts six and seven were "subject to the mandatory sentencing provisions of the Graves Act," N.J.S.A. 2C:43-6(c). The judge found aggravating factors three, six, and nine, as well as mitigating factor five. See N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that the defendant will commit another offense"); N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted"); N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"); N.J.S.A. 2C:44-1(b)(5) ("[t]he victim of the defendant's conduct induced or facilitated its commission").

23

The judge recounted that defendant was "[thirty-seven] years old" and had "a juvenile record consisting of one arrest, with one diversion," as well as an adult record consisting of "[seventeen] arrests, six disorderly [persons] convictions, three ordinance violations[,] and two indictable convictions." The two indictable convictions upon which his persistent offender status was premised were both drug related, consisting of a second-degree offense for which defendant received a five-year prison sentence, and a third-degree offense for which he received a two-year probationary term.

Ascribing substantial weight to the aggravating factors, the judge pointed out that defendant's criminal history showed "serious[]" and "consistent contact with the criminal justice system" despite having served a prison term. Further, the conduct for which defendant was convicted, which "centered around . . . the use of [a] firearm outside the confines of . . . his house" with "children [living] in the neighborhood," showed "a [strong] need for deterrence." On the other hand, crediting "the defense version" of "what may . . . have precipitated . . . defendant's conduct,"[10] the judge found mitigating factor five, albeit attributing

_____

[10]   Without speculating on the actual basis for the jury's verdict, the judge recounted "the different scenarios" presented at trial under which the shooting occurred.

24

minimal weight, based on "the victim, in some way, shape or form expos[ing] himself to this conduct."

Nonetheless, in balancing the factors, the judge found "that the aggravating factors . . . preponderate[d] over the mitigating factor," and, "having regard for the nature and circumstances of the offense[s]," determined that "imprisonment [was] necessary for the protection of the public." Accordingly, the judge sentenced defendant to an extended term of sixteen years' imprisonment, with an eight-year period of parole ineligibility, on count seven, a concurrent eight-year term of imprisonment, with a four-year period of parole ineligibility, on count six, and a concurrent six-month county jail term on count two. Defendant's sixteen-year extended-term sentence is within the range between the five-year minimum of the ordinary-term range for a second-degree offense, N.J.S.A. 2C:43-6(a)(2), and the twenty-year maximum of the extended-term range for that offense, N.J.S.A. 2C:43-7(a)(3). See State v. Case, 220 N.J. 49, 64-65 (2014) ("[W]hen the aggravating factors preponderate, sentences will tend toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

Defendant does not dispute his eligibility for extended term sentencing as a persistent offender or that his sentence falls within the permissible range.

Instead, citing State v. Vasquez, 374 N.J. Super. 252, 267 (App. Div. 2005), defendant essentially argues that using the same convictions as both a basis for finding a defendant should be sentenced to an extended term, as well as a basis for finding an aggravating factor to increase the length of a defendant's sentence, is prohibited "double-counting." In Vasquez, we determined the sentencing judge erred in "rais[ing] the presumptive extended base term on account of defendant's only prior conviction, the very conviction which both allowed and required an extended term." Ibid. We concluded "[t]o do so was a form of 'double-counting.'" Ibid.

However, in State v. Tillery, 238 N.J. 293, 327 (2019), our Supreme Court found "no error in the trial court's reliance on defendant's criminal record both to determine defendant's 'persistent offender' status under N.J.S.A. 2C:44-3(a) and to support the court's finding of aggravating factors three, six, and nine." Indeed, the Tillery Court confirmed that "the defendant's criminal record may be relevant in both stages of the sentencing determination" as "defendant's prior record is central to aggravating factor six, N.J.S.A. 2C:44-1(a)(6), and may be relevant to other aggravating and mitigating factors as well." Id. at 327-28 (emphasis added). Likewise, in State v. McDuffie, 450 N.J. Super. 554, 576-77 (App. Div. 2017), we rejected, "as lacking merit," the defendant's claim that "the

26

court impermissibly double-counted his criminal record, when granting the State's motion for a discretionary extended term, and again, when imposing aggravating factor six . . . ." We explained that defendant's "criminal history was not a 'fact' that was a necessary element of an offense for which he was being sentenced" and the sentencing judge was not "required to ignore the extent of his criminal history when considering applicable aggravating factors" where it was undisputed that defendant "had more than the requisite number of offenses to qualify for an extended term." Ibid. (citing State v. Kromphold, 162 N.J. 345, 353 (2000)).

Here, the record reflects the judge did not "double-count" the offense that triggered the extended term as an aggravating factor, but rather found the aggravating factor based on the "competent credible" evidence of defendant's "constant[]" contacts with the criminal justice system. As the judge stated, "[d]efendant's prior record certainly establishes that he's been unable to remain out of criminal trouble for any period of time." Therefore, we find no violation of Vasquez and no abuse of discretion. We also reject defendant's contention that the judge focused on defendant's "criminal history alone," instead of "the offense itself" in violation of State v. Dunbar, 108 N.J. 80, 91-92 (1987).

27

In <u>Dunbar</u>, our Supreme Court explained that "[o]nce the decision to impose an extended term has been made, the court should then return its focus primarily to the offense." <u>Id.</u> at 91. However, "other aspects of the defendant's record, which are not among the minimal conditions for determining persistent offender status, such as a juvenile record, parole or probation records, and overall response to prior attempts at rehabilitation, will be relevant factors in adjusting the base extended term." <u>Id.</u> at 92. Here, the judge's consideration of other aspects of defendant's record as well as the different scenarios of the offenses presented at trial clearly belie defendant's contention.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

28                                                                    A-2573-18